**FOURTH DIVISION**
**DOYLE, P. J.,**
**ANDREWS, P. J., and BOGGS, J.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**March 14, 2013**

# In the Court of Appeals of Georgia

A12A2469. COSMO v. THE STATE.

BOGGS, Judge.

Dennis Cosmo appeals from his convictions of a violation of the "Computer or Electronic Pornography and Child Exploitation Prevention Act," OCGA § 16-12-100.2 (d) (1), attempt to commit a felony (pandering), and three counts of criminal solicitation.[1] He asserts that insufficient evidence supports his computer pornography conviction and that he is entitled to a new trial on the remaining charges against him based upon the trial court's refusal to give an entrapment charge to the jury. We agree with both contentions and are therefore constrained to reverse.

When reviewing the sufficiency of the evidence,

---

[1] The jury found Cosmo not guilty of attempt to commit child molestation and attempt to commit aggravated child molestation.

the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

(Citations omitted; emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SC 2781, 61 LE2d 560) (1979). So viewed, the record shows that Cosmo responded to the following posting in the northwest Georgia personals section of www.craigslist.com: "Hey guys. We[']re back in town and looking forward to return engagements with our old friends . . . drop us a line if you're interested." The posting was placed by an undercover agent with the Northwest Georgia Crimes Against Children Task Force posing as a woman named "Amber," and this agent began corresponding with Cosmo online. After Cosmo wrote that he was interested in "kinky fun," the agent wrote,

the girls and I provide a rather unique service to a select group of special gentleman who are interested in experiences a bit outside the norm.

2

> Let's just say that we sometime[s] help our friends take things beyond the legal limit. Most men aren't interested in what we provide (or at least they don't openly admit their interest). So if you're interested in things that are a little over the line, you might want to get back with me.

When Cosmo inquired about the specific service, the agent replied, "I have three very unique daughters, and we (or one of us) can certainly provide almost any desired service . . . our service is a bit taboo . . . Understand that our services are not free." Cosmo then indicated that he was interested in "multiple girls in one bed" because he had "never been with two women at once." Specifically, "the mother-daughter combo. Or maybe sisters." After the agent disclosed that she was 32 and her daughters were 14, 12, and 9 years old, she asked Cosmo to explain "exactly what you want." Cosmo wrote, "you definitely [sic] and leaning towards the 14 yo depending on price. maybe even 12 if I can afford three. . . . Have she done this before or the things I mentioned in the email and knows what to expect with this meet?" After the agent replied, "[t]he girls are very experienced," Cosmo provided a detailed description of the sex acts he would like the 14-year old to perform with him. A meeting was then arranged and Cosmo confirmed that he was "good with just you and [the 14-year-old]." He also asked "Amber" to verify that she was not with the media or law enforcement because he had never "done anything like this and I too am cautious." The agent replied,

3

I am not any part of any law enforcement organization or affiliated with the media. . . . I'm sure you understand that a police officer could not suggest these acts. Some also say that if you ask an officer directly if he or she is affiliated with the police they must answer truthfully. I'm not sure if that's true, but I will tell you that I am not the police or anything related to law enforcement.

A woman posing as "Amber" then talked with Cosmo by telephone to arrange their meeting in more detail. During the course of telephone conversations and text messages with "Amber," Cosmo indicated that he wanted to meet with her alone first before she brought her daughter and that he was "not comfortable with this underage thing." In a text message, he also wrote just you and me though right?" "Amber" then sent a text stating: she sensed "indecision" regarding the 14-year-old; "that is not the type of client i feel most comfortable with;"and "if I got the wrong impression I need to make other arrangements." In a telephone call, "Amber" and Cosmo decided that he would meet alone with Amber first and that she would leave to go get her daughter "later." After this conversation, Cosmo reassured her by text that "i think we are on the same page now. im already on the road there so im committed." Three hours later and approximately twenty minutes before they were scheduled to meet, Cosmo again

sent another text stating, "just you and me right?" Four minutes after receiving this text, "Amber" called Cosmo and the following conversation took place:

Amber: Hey, I just got your last text message. I just, are you that, are you that conflicted about everything? It's like I said, I just detect so much indecision, and if you're, if you're that indecisive, then, I don't know, maybe we should make different arrangements.

Denny: What do you mean different arrangements?

Amber: Well, I'm just, I'm, I'm curious, what exactly it is that you want? I was under the impression that you were really clear in your messages exactly what was going to happen and, and now, you seem to be backing off of, of what we had arranged and I need to know in order to plan exactly what's going to happen.

Cosmo: Uh, let's just keep it at you and me. I'm not, I'm not, too comfortable with uh, with the, the underage thing.

Amber: Okay well then, um. Okay, well, it's just my impression that, that you were, that you were certainly comfortable with that earlier. And see that's, that's kind of my unique business. That's what I have to offer that's different than, than other people. So, I, I don't know, I'm just very confused by your intentions. But, that's fine.

5

Cosmo:      All right. I'm sorry about, for the confusion. Ya know, I've never done that before. I'm not too, too comfortable.

Amber:      Okay well, it's, that's, I just, that's fine. I just understood one thing from you, and um, I'm just getting a different impression now. So.

Cosmo:      Yeah. I'm sorry for that.

Amber:      All right, all right, that's fine. Not a problem. All right. Well, uh, you're this side of Calhoun?

Cosmo:      Uh, yeah.

Amber:      Okay. Well, I'll see you soon then.

Cosmo      Did you, uh, did you already eat?

Amber      No, I haven't.

Cosmo:      You want to get something to eat?

Amber:      Yeah we can do that. It's not a problem. That sounds good.

Cosmo:      All right. . . . What's there around there?

. . .

Cosmo:     Okay, do you want to, uh, where we are meeting?

Amber:     At the room. You got the number, right? It's 114. It's Quality Inn. All right, well that sounds great. I'll see you soon.

Cosmo:     Alright Amber, I'm sorry for the confusion, but, you know I, when it comes down to it, I don't know if I could do it.

Amber:     Okay well, I just, I just thought you were really clear earlier. And you seem to be, change your mind, and I'm not used to that. So I just thought I would try to clear things up with you.

Cosmo:     Yeah. I understand, I'm sorry.

Amber:     Okay. All right. See you soon.

Cosmo:     All right. Bye, bye.

When Cosmo arrived at the designated motel room, he was taken into custody.

Cosmo testified that a desire for under-age sex "wasn't even in [his] mindset until Amber introduced it." He explained that Amber brought up the topic of mother-daughter sex and he initially thought this meant that both would be over 18 years old. When she brought up the underage sex, he said what he "had to say to bring her

7

[Amber] along," and keep her interested in him because she was the only person communicating with him online the week before he was scheduled to deploy to Afghanistan. He explained that he "gave her a response that [he] expected she wanted to hear." At one point in his testimony he explained that "in the whole World Wide Web, especially with sex, you can get people to say some things that are not in their nature." He testified that his intent was only for "a one-on-one meet with one adult person" and that at no time did he intend to engage in sex with a minor.

He also testified that he had previous online experiences where he communicated with a person he thought was a woman that turned out to be a man. Based upon these experiences, he did not "believe everything I read on the Internet" and did not know whether Amber's daughters even existed because he was "getting third party information from someone [he] never met in person."

The State charged Cosmo in Count 1 with a violation of OCGA § 16-12-100.2 (d)(1), alleging that he "intentionally utilize[d] a computer Internet service to attempt to solicit, Brooke [the 14-year-old], a person believed by the accused to be a child, to commit child molestation and aggravated child molestation." It also charged him with attempt to commit a felony in violation of OCGA §§ 16-4-1 (attempt) and 16-6-12 (pandering) with regard to his March 12, 2010 offer to commit sexual acts with the

8

14-year-old (Count 2); solicitation in violation of OCGA § 16-4-7 with regard to his solicitation of the adult, Amber, to commit aggravated child molestation (Count 3); two counts of solicitation in violation of OCGA § 16-4-7 with regard to his solicitation of the adult, Amber, to commit child molestation (Counts 4 and 5); and attempt to commit a felony in violation of OCGA § § 16-4-1 (attempt) and 16-6-4 (child molestation) with regard to his March 14, 2010 communications with Amber to arrange for oral sex with the 14-year-old (Count 6); and attempt to commit a felony in violation of OCGA § § 16-4-1 (attempt) and 16-6-4 (child molestation) with regard to his March 14, 2010 communications with Amber to arrange for sexual intercourse with the 14-year-old (Count 7). The jury convicted Cosmo on Counts 1-5 and acquitted him of Counts 6 and 7. The trial court sentenced Cosmo to 10 years on Counts 1-2 and three years on Counts 3-5, with all sentences to be served concurrent to Count 1, the first 12 months to be served in a Probation Detention Center, and the remainder on probation.

1. Cosmo contends insufficient evidence supports his conviction under OCGA § 16-12-100.2 (d) (1) because the State failed to prove that he interacted with a child or a person he believed to be a child. This Code section provides:

It shall be unlawful for any person intentionally or willfully to utilize a computer on-line service or Internet service, including but not limited to a local bulletin board service, Internet chat room, e-mail, on-line messaging service, or other electronic device, to seduce, solicit, lure, or entice, or attempt to seduce, solicit, lure, or entice *a child or another person believed by such person to be a child to commit* any illegal act described in Code Section 16-6-2, relating to the offense of sodomy or aggravated sodomy; Code Section 16-6-4, relating to the offense of child molestation or aggravated child molestation; Code Section 16-6-5, relating to the offense of enticing a child for indecent purposes; or Code Section 16-6-8, relating to the offense of public indecency or to engage in any conduct that by its nature is an unlawful sexual offense against a child.

(Emphasis supplied.) Cosmo asserts that because the State's evidence failed to show *any* interaction between himself and a child or a person he believed to be a child, insufficient evidence supports his conviction. We agree based upon the particular facts and circumstances of this case.

"Where the violation of a statute is made criminal, it must be tested by the rule of strict construction applicable to criminal statutes." *Burmaster v. State*, 233 Ga. 753, 755 (213 SE2d 650) (1975). "[I]n applying this rule the plain meaning of language must not be disregarded, but will be given full effect." *Cargile v. State*, 194 Ga. 20, 23 (2) (20 SE2d 416) (1942). And "[w]hen a criminal statute fairly and

10

reasonably is subject to two constructions, one which would render an act criminal, the other which would not, the statute must be construed strictly against the State and in favor of the accused." (Citation omitted.) *Frix v. State*, 298 Ga. App. 538, 542-543 (1) (a) (680 SE2d 582) (2009). We therefore agree with Cosmo's contention that the plain meaning of the phrase "seduce, solicit, lure, or entice a child or another person believed by such person to be a child to commit any illegal act" cannot be construed to encompass his communication with only an adult or a person known to be an adult. We must therefore reverse his conviction under OCGA § 16-12-100.2 (d) (1) (Count 1). Compare *Bolton v. State*, 310 Ga. App. 801, 805 (1) (714 SE2d 377) (2011) (State presented sufficient evidence to support conviction under OCGA § 16-12-100.2 (d) (1) based in part upon evidence that defendant believed he was corresponding online with a 15-year-old girl); *Logan v. State*, 309 Ga. App. 95, 100 (2) (b) (709 SE2d 302) (2011) (State presented sufficient evidence to support conviction under same Code section based in part upon evidence that defendant believed he was corresponding online with a 14-year-old girl).

2. Cosmo contends that he is entitled to a new trial on his remaining convictions because the trial court erred by denying his request for a charge on his defense of entrapment. The record shows that the trial court denied Cosmo's request

11

for this charge based upon its belief that Cosmo must admit all elements of the crime, including intent, in order to obtain an entrapment charge.

"As a general rule, in order to raise the defense of entrapment, the defendant must first admit the commission of the crime and then show that he did so because of the unlawful solicitation or inducement of a law enforcement officer. *Gregoroff v. State*, 248 Ga. 667, 669-670 (285 S E2d 537) (1982)." *St. Jean v. State*, 255 Ga. App. 129, 130 (564 SE2d 534) (2002). The Supreme Court of Georgia, however, has also recognized the following exception to the general rule: "when the State's case shows evidence of entrapment and the defendant offers no evidence of entrapment inconsistent with his defense that he did not commit the crime, the defendant is not required to admit the commission of the crime in order to be entitled to a charge on entrapment." *Gregoroff,* supra, 248 Ga. at 672. In this case, Cosmo "presented evidence of entrapment that arguably was not inconsistent with his denial of the commission of the crime; therefore we must look to the evidence presented by the State to determine whether appellant was entitled to a charge on entrapment." *St. Jean*, supra, 255 Ga. App. at 130.

"Entrapment consists of three distinct elements '(1) the idea for the commission of the crime must originate with the state agent; (2) the crime must be induced by the

agent's undue persuasion, incitement, or deceit; and (3) the defendant must not be predisposed to commit the crime.'" (Citations, punctuation and footnote omitted.) *Ellzey v. State*, 272 Ga. App. 253, 257 (1) (612 SE2d 77) (2005). And, "[o]nly 'slight evidence' is required to authorize a charge on a subject." (Citation, punctuation and footnote omitted.) *Ellzey*, supra. In this case, the evidence presented by the State showed that the idea for the commission of the crime originated with a state agent. It also shows that Cosmo may have been induced by Amber's repeated statements that if the "over the line" services she offered were not what Cosmo was looking for, she hoped that he could find the companionship he was looking for elsewhere, as well as her statement that "she was not really sure why [Cosmo] would need her services." Finally, the State also presented evidence that Cosmo may not have been predisposed to commit the crime as he informed "Amber" by email "[p]lease understand i have not done anything like this . . . I am just a man with an overactive sex drive," and by two separate text messages attempting to confirm "just you and me though right?"

While the State also presented evidence "authorizing rejection of an entrapment defense, there was evidence that would have enabled the trier of fact to carry on a legitimate process of reasoning regarding whether [Cosmo] had been entrapped." *Ellzey*, supra. Although we view the content of some of Cosmo's emails with

13

repugnance, this Court cannot allow our personal distaste to erode our obligation to ensure that criminal defendants receive a fair trial and the jury charges to which they are entitled. We must therefore conclude that the trial court's failure to charge on entrapment was reversible error and that Cosmo is entitled to a new trial on Counts 2-5 of the State's indictment. See *Gregoroff*, supra, 248 Ga. at 672; *Ellzey*, supra, 272 Ga. App. at 257.

*Judgment reversed. Doyle, P. J. and Andrews, P. J., concur*.